ORDERED.

Dated: January 12, 2022

_____
Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No. 8:12-bk-05200-MGW
                                                          Chapter 7
Charles Wesley Maddox
and Vicki Lynn Maddox,

    Debtors.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Coastal Land Development Group, a dissolved real estate development company, recently recovered roughly $170,000 in net settlement proceeds from a BP Oil Spill claim. The Chapter 7 Trustee of the Debtors' bankruptcy estate claims Wes Maddox—one of the co-Debtors in this case—is entitled to 75% of the net settlement proceeds because the company's tax returns show he owns 75% of the company. But five investors (referred to as the "Interested Parties") claim they are entitled to 67.4% of the net settlement proceeds because they invested 67.4% of the cash raised by Coastal. The Court must now determine how to allocate the net settlement proceeds between the bankruptcy estate and the Interested Parties.

To properly allocate the net settlement proceeds, the Court must first determine the Debtors' and Interested Parties' respective membership interests in Coastal. Because the BP Oil Spill claim belongs to Coastal, not Maddox, the Court is governed by section 605.0710, Florida Statutes, which generally provides that (after first paying creditors) the assets of a dissolved limited liability company are distributed to the company's members. Although the parties agree that the company's members are entitled to share in the net settlement proceeds in the same proportion as their membership interest, the parties disagree over the extent to which each other has a membership interest in Coastal.

The evidence at trial establishes that Maddox intended that each of the investors should receive a "pro rata" membership interest in Coastal in exchange for their financial contribution. According to Coastal's tax returns, four investors (including two of the Interested Parties) received membership interests in the company (in exchange for their financial contribution) based on the company having a $5 million valuation. Coastal's accountant, however, inadvertently failed to account for the fact that the remaining investors should have received membership interests in Coastal. Because Maddox intended that each of the investors would receive a "pro rata" interest in the company, the Court concludes it is appropriate to allocate membership interests—based on Coastal having a $5 million valuation—to the investors who were not identified on Coastal's tax returns.

Allocating membership interests to investors based on Coastal having a $5 million valuation, Wes Maddox and Vicki Maddox (Wes Maddox's former spouse)

own a collective 68.56% interest in Coastal. The bankruptcy estate is therefore entitled to 68.56% (or $115,832.12) of the net settlement proceeds.

## I. Findings of Fact

Wes Maddox is a business developer.[1] He seeks out business opportunities; finds investors for them; and, in exchange, takes a modest position in the business.[2] Over the years, he has taken a position in a variety of businesses, including real estate development companies.[3] "[S]ometimes it works sometimes it doesn't."[4] This case is about a real estate development business that didn't work out.

### A. Wes Maddox creates Coastal Land Development to develop real estate.

In 2004, Wes Maddox formed Coastal Land Development Group, which, as the name suggests, was a real estate development company.[5] In 2004 and 2005, the company bought four parcels of property—one in Hillsborough County, Florida and three in Gulf County, Florida—to develop and re-sell.[6] The Hillsborough County

---

[1] Trustee's Ex. 78, Doc. No. 195-5, p. 10, ll. 8 – 20.

[2] *Id.*

[3] *Id.* at p. 10, l. 21 – p. 11, l. 2.

[4] *Id.* at p. 10, ll. 13 – 20.

[5] *Id.* at p. 16, l. 15 – p. 21, l. 14.

[6] *Id.* at p. 16, l. 22 – p. 17, l. 9.

3

property was in an urban area, while the three Gulf County properties were waterfront properties.[7]

### B. The Interested Parties obtain a membership interest in Coastal.

Over the years, Maddox made significant contributions to Coastal. In terms of cash, Maddox put anywhere from $275,000 to $340,000 into the company.[8] In addition to contributing cash, Maddox also personally guaranteed more than $500,000 in mortgage debt on Coastal's four properties.[9] And he managed the company.[10] But, in terms of money, most of the contributions came from outside investors.

In all, Coastal raised nearly $1.9 million from outside investors. Of that amount, nearly $1.3 million came from the Interested Parties: Perry Horner; Frank and Barbara Napoli; Kevin and Denise Hertenstein; Bruce and Diane Jones; and the Plumbing Heating Cooling Contractors Association Fund Trust.[11] Although each of

---

[7] *Id.*

[8] *Id.* at p. 20, l. 19 – p. 21, l. 14. At his deposition, Maddox testified that, over time, he put anywhere from $325,000 to $340,000 into the company. At trial, the interested parties introduced an exhibit purportedly reflecting the various financial contributions to Coastal. Interested Parties' Ex. 11, Doc. No. 189-11. That exhibits shows Maddox contributed $275,000. *Id.*

[9] Trustee's Ex. 2, Doc. No. 191-2, Schedule F.

[10] Interested Parties' Ex. 12, Doc. No. 189-12; Trustee's Ex. 78, Doc. No. 195-5, p. 16, l. 15 – p. 17, l. 18.

[11] Interested Parties' Ex. 11, Doc. No. 189-11. Specifically, the Interested Parties collectively contributed $1,272,000 to Coastal. *Id.* The remaining funds (other than those contributed by Wes Maddox) were contributed by Rufus Ashby Sr. ($215,000); Edward and Betsy Owens ($50,000); Vicki Maddox ($40,000); and Amanda Maddox ($35,000). *Id.*

the Interested Parties received a promissory note in exchange for their investment, Maddox intended that each of the investors—all of whom were friends or business acquaintances of his—would receive a membership interest in the company.[12] As investors (such as the Interested Parties) contributed cash to the company, they were supposed to take a "pro rata percentage share" in the company, and Maddox's interest, in turn, would be reduced.[13]

For some of the Interested Parties (and other investors), that appears to have been the case. Although no membership interests were ever issued to any of Coastal's investors,[14] Coastal's 2006, 2008, and 2009 tax returns listed Perry Horner as owning a 14% interest in the company; the Joneses as owning a 5.2% interest; Rufus Ashby Sr. (who is not one of the interested parties) as owning a 4.3% interest; and the Owenses as owning a 1% interest.[15]

For the remaining Interested Parties, however, none of Coastal's tax returns list them as owners.[16] Maddox blames that on the company's accountant.[17] He says

---

[12] Trustee's Ex. 78, Doc. No. 195-5, p. 20, l. 19 – p. 21, l. 14; p. 22, ll. 1 – 21; Trustee's Ex. 18, Doc. No. 191-18, p. 6, l. 18 – p. 7, l. 1; Trustee's Ex. 29, Doc. No. 191-29, p. 8, ll. 14 – 22; Trustee's Ex. 35, Doc. No. 191-35, p. 7, l. 16 – p. 8, l. 10; Trustee's Ex. 46, Doc. No. 191-46, p. 8, ll. 12 – 17.

[13] Trustee's Ex. 78, Doc. No. 195-5, p. 20, l. 19 – p. 21, l. 14.

[14] *Id.* at p. 21, l. 5 – p. 23, l. 5.

[15] Interested Parties' Exs. 14, 17 & 19, Doc. Nos. 189-14, 189-17 & 189-19.

[16] Interested Parties' Exs. 14, 17 & 19, Doc. Nos. 189-14, 189-17 & 189-19.

[17] Trustee's Ex. 78, Doc. No. 195-5, p. 20, l. 19 – p. 21, l. 14.

the accountant never made adjustments for the fact that some of the Interested Parties came in as investors.[18]

### C.   Coastal files a BP Oil Spill Claim.

On April 20, 2010, the *Deepwater Horizon* oil drilling rig exploded, causing millions of gallons of crude oil to spill into the Gulf of Mexico.[19] After the *Deepwater Horizon* disaster (known colloquially as the BP Oil Spill) and the 24-hour news coverage that followed it, Coastal could not do anything with its properties:

> After the Deepwater Horizon Spill and the 24[-hour] news cycle, we couldn't build, we couldn't buy, we couldn't sell, we couldn't refinance. We couldn't do anything.[20]

Unable to do anything with the properties, Coastal had to short sell the Hillsborough County property and, when it could no longer afford the mortgage payments, give the three Gulf County properties back to the bank.[21] Within six months of the BP oil spill, Coastal filed a *Deepwater Horizon* incident claim (known as a "BP Oil Spill Claim") with the Gulf Coast Claims facility.[22]

---

[18] *Id.* at p. 21, l. 15 – p. 23, l. 5.

[19] The Court can take judicial notice of that "the Deepwater Horizon oil spill, otherwise known as the BP oil spill, occurred on April 20, 2010 in the Gulf of Mexico." *EBSCO Gulf Coast Dev., Inc. v. Salas*, 2018 WL 7288764, at *3 (N.D. Fla. Aug. 1, 2018).

[20] Trustee's Ex. 78, Doc. No. 195-5, p. 24, ll. 8 – 20.

[21] *Id.* at p. 24, l. 8 – p. 25, l. 6.

[22] *Id.* at p. 77, l. 19 – p. 81, l. 6. The date Coastal initially filed the BP Oil Spill Claim is unclear. At his deposition, Maddox testified he did not know when Coastal first filed its BP Oil Spill claim. *Id.* The Trustee then showed Maddox three letters—dated December 16, 2010; January 24, 2011; and January 31, 2011—referring to the claim being filed on April 20, 2010. *Id.* After having his "recollection refreshed," Maddox testified the claim was filed on April 20, 2010. Of course, the

### D. The Trustee obtains authority to administer the BP Oil Spill claim.

Nearly two years after Coastal filed its BP Oil Spill claim, Maddox (along with his then-wife, Vicki) filed for chapter 7 bankruptcy.[23] In his bankruptcy schedules, Maddox disclosed a 75% interest in Coastal; scheduled the company as having no value; and claimed his 75% interest in the company as exempt.[24] Nowhere in his schedules did Maddox disclose that Coastal had filed a BP Oil Spill claim.[25] Four years after the Debtor received his discharge and his chapter 7 bankruptcy case was closed,[26] the Trustee discovered that Coastal was still pursuing its BP Oil Spill claim.[27]

According to the Trustee, Coastal was seeking $400,000 in lost profits from the BP Oil Spill and attempting to negotiate a settlement with the Gulf Coast Claims Facility.[28] If, in fact, the BP Oil Spill claim was worth $400,000, then Coastal, which Maddox scheduled as having no value, potentially had significant value.[29] So the Trustee sought to reopen the bankruptcy case and, based on Maddox's scheduled

---

claim could not have been filed on April 20, 2010 because that was the date of the BP Oil Spill. *Id.* But, given the dates on the letters, we know the claim must have been filed by December 16, 2010.

[23] *Id.* at p. 77, l. 19 – p. 81, l. 6.

[24] Trustee's Ex. 2, Doc. No. 191-2, Schedules B & C.

[25] *Id.*

[26] Trustee's Ex. 4, Doc. No. 191-4, ¶¶ 4 & 5; Doc. Nos. 43 & 50.

[27] Trustee's Ex. 4, Doc. No. 191-4, ¶ 12.

[28] *Id.*

[29] *Id.* at ¶ 14.

7

75% interest in the company, have the Court authorize the Trustee to administer the BP Oil Spill claim on Coastal's behalf and recover 75% of any settlement proceeds for the benefit of the estate.[30]

The Court granted the Trustee's request and concluded that the Trustee had full authority over Maddox's 75% ownership interest in Coastal; was authorized to negotiate Coastal's BP Oil Spill claim; and was authorized to act as the decisionmaker for Coastal in the BP Oil Spill claim litigation.[31] The Court later clarified, at the request of the Interested Parties, who at the time claimed to be creditors of Coastal, that the Interested Parties had the right to participate in and approve any BP Oil Spill settlement.[32]

### E. The Trustee and Interested Parties fight over the net proceeds from the BP Oil Spill settlement.

Eventually, the Trustee settled Coastal's BP Oil Spill claim for $300,000.[33] The Interested Parties—who no longer claimed to be creditors of Coastal but instead claimed to collectively own roughly a 67% interest in the company—objected.[34] The Court approved the proposed compromise over the Interested Parties' objection.[35]

---

[30] *Id.* at ¶¶ 7 – 21.

[31] Trustee's Ex. 7, Doc. No. 191-7, ¶¶ 3 – 4.

[32] Trustee's Exs. 9 & 11, Doc. Nos. 191-9 & 191-11.

[33] Trustee's Ex. 12, Doc. No. 191-12, ¶ 3.

[34] Trustee's Ex. 13, Doc. No. 191-13, ¶¶ 5, 12, 13 & 16.

[35] Trustee's Ex. 14, Doc. No. 191-14.

The compromise generated $168,949 in net proceeds.[36] The Interested Parties have now moved to disburse the net proceeds under chapter 605, Florida Statutes.[37]

In their motion to disburse, the Interested Parties, apparently backtracking on their claim of being owners, argue that they are entitled to be paid first from the net settlement proceeds under chapter 605, Florida Statutes, because they are creditors of Coastal.[38] And because the Interested Parties' "claims"—which total nearly $1.3 million—far exceed the $168,949 in net settlement proceeds, the bankruptcy estate would not receive any of the net settlement proceeds under the Interested Parties' proposed distribution. The Trustee objects.[39] After conducting a one-day trial on the Interested Parties' motion, this Court must now determine how the net settlement proceeds should be disbursed.

## II. Conclusions of Law

Because the BP Oil Spill claim was owned by Coastal, which has been administratively dissolved, this Court must look to section 605.0710, Florida Statutes, to determine how much of the settlement proceeds, if any, should flow to

---

[36] The settlement was for $300,000. Of that amount, $131,051 was paid to the law firm that prosecuted Coastal's BP Oil Spill claim. Doc. No. 144.

[37] Doc. No. 146.

[38] *Id.*

[39] Doc. No. 159. Vicki Maddox, a co-Debtor in this case, likewise objects to the Interested Parties' proposed distribution. Doc. No. 147.

the bankruptcy estate.[40] Under section 605.0710, Florida Statutes, the assets of a dissolved limited liability company must first go to pay the company's creditors.[41] Any surplus assets are then distributed to the company's members in the same proportion as the members shared in distributions before dissolution.[42] Thus, to determine whether the estate is entitled to any of the net settlement proceeds, the Court must first determine whether the Interested Parties are creditors or members of Coastal; if the Interested Parties are members, the Court must determine the extent to which the Interested Parties were entitled to share in distributions before dissolution.[43]

---

[40] *Miner v. Bay Bank & Trust Co. (In re Miner)*, 185 B.R. 362, 366 (N.D. Fla. 1995) ("Under Florida law, the stockholders do not hold title to property owned by the corporation. Rather, the corporation, as a legal entity, holds the title. However, appellants contend that because Miner Corp. was a dissolved corporation, the result should be different, at least in the bankruptcy context. . . . Under the plain language of Section 607.1405, equitable title to a dissolved corporation's property no longer passes to the corporate directors at the time of the dissolution."); *Barfield v. Sana of Jacksonville, Inc. (In re Barfield)*, 261 B.R. 793, 798 (Bankr. M.D. Fla. 2001) ("The Court concludes that a debtor/shareholder similarly lacks sufficient interest in the property of his dissolved corporation to successfully move for turnover of that dissolved corporation's assets absent some direct transfer of an interest in those assets to debtor/shareholder."). *Miner* and *Barfield* were decided under the original Florida Limited Liability Company Act. But the outcome is the same under the Revised Limited Liability Company Act. § 605.0717(1)(a), Fla. Stat. (providing that dissolution of a limited liability company does not transfer title to the limited liability company's assets).

[41] § 605.0710(1), Fla. Stat. (2021). The parties agree that section 605.0710, Florida Statutes, governs (presumably because the Court is determining how Coastal's assets should be disbursed today) even though chapter 605, Florida Statutes, did not take effect until after Coastal was administratively dissolved. Ch. 2013-180, §§ 27 & 28, 2013 Fla. Sess. Law Serv. (West). Even if the original Florida Limited Liability Company Act applied, the outcome would be the same. § 608.444, Fla. Stat. (2013).

[42] § 605.0710(2)(b), Fla. Stat. (2021).

[43] No one other than the Interested Parties has claimed an interest in the net settlement proceeds by virtue of being a creditor of Coastal. So, if the Interested Parties are not creditors, then the net settlement proceeds should be distributed to Coastal's members (including the Interested Parties) in the same proportion as they shared in distributions before dissolution.

### A.   The Interested Parties are members of Coastal.

At first glance, it is tempting to conclude the Interested Parties are creditors of Coastal. After all, the Interested Parties received promissory notes in exchange for their financial contributions to the company; there was no written agreement for the Interested Parties to receive membership interests in Coastal; no membership interests were ever actually issued to the Interested Parties; and in at least two court filings in this case, the Interested Parties took the position they were creditors.

But the evidence at trial proved that Maddox intended to give the Interested Parties' a membership interest in Coastal in exchange for their investment;[44] despite their conflicting filings in this case, the Interested Parties believed they were "investors" (read "owners" or "members");[45] Coastal's tax returns reflect that some of the Interested Parties, in fact, held membership interests in the company;[46] and disclosures filed as part of the BP Oil Spill claims process listed each of the Interested Parties as "shareholders."[47]

Perhaps more important, the parties agreed at trial that the Interested Parties are members. After taking conflicting positions in this case, the Interested Parties ultimately settled on claiming a membership interest in Coastal. And for his part, the

---

[44] Trustee's Ex. 78, Doc. No. 195-5, p. 20, l. 19 – p. 21, l. 14; p. 22, ll. 1 – 21.

[45] *See, e.g.,* Trustee's Ex. 18, Doc. No. 191-18, p. 24, l. 21 – p. 25, l. 4; Trustee's Ex. 29, Doc. No. 191-29, p. 13, l. 21 – p. 14, l. 3; p. 29, ll. 2 – 10; Trustee's Ex. 46, Doc. No. 191-46, p. 22, ll. 1 – 3.

[46] Interested Parties' Exs. 14, 17 & 19, Doc. Nos. 189-14, 189-17 & 189-19.

[47] Interested Parties' Ex. 27, Doc. No. 189-27.

Trustee has consistently maintained the Interested Parties are members—not creditors—of Coastal. Because the parties agree the Interested Parties are members, and there was evidence at trial supporting that contention, the Court concludes that the Interested Parties are members of Coastal.

    **B.    The bankruptcy estate is entitled to 68.46% of the net settlement proceeds.**

Determining that the Interested Parties are members of Coastal is the easy part; the hard part is determining the extent to which they are entitled to share in the net settlement proceeds. Naturally, the parties take completely different approaches to resolve this issue.

On the one hand, the Interested Parties say their interest in the net settlement proceeds should be proportional to the amount they invested in Coastal (as a percentage of the total amount Coastal raised). Specifically, Coastal raised $1,887,000. Of that amount, $1,272,000—or 67.4%—came from the Interested Parties. Thus, the Interested Parties claim they are entitled to 67.4% of the net settlement proceeds. On the other hand, the Trustee claims that the Court should rely solely on Coastal's tax returns and the Debtors' schedules, which show Maddox owns a 75.5% interest in Coastal and is entitled to 75.5% of Coastal's profits.

Both approaches suffer from obvious defects.

Start with the Trustee's approach: while Coastal's tax returns indicate that Maddox owns 75.5% of Coastal and that various investors (including two of the

Interested Parties) own the remaining 24.5%,[48] three of the Interested Parties—the Hertensteins, the Joneses, and the Plumbing Heating Cooling Contractors Association Fund Trust—are not listed on the tax returns as holding any membership interest.[49] If the Court were to adopt the Trustee's approach, then those three Interested Parties would not be entitled to any membership interest in Coastal (or any share of the net settlement proceeds) even though the Trustee concedes they are members of Coastal and even though they invested more than $300,000 in the company.[50]

As for the Interested Parties' approach, it is contrary to both law and fact. As a matter of law, the Interested Parties cite no authority for the proposition that a person's membership interest in a limited liability company is determined solely by the amount of *cash* the person contributes. To the contrary, Florida law specifically provides that the "contribution" a person makes to a limited liability company to

---

[48] Interested Parties' Exs. 14, 17 & 19, Doc. Nos. 189-14, 189-17 & 189-19. The tax returns likewise show that Maddox is entitled to share in 75.5% of Coastal's profits, while the remaining members are entitled to 24.5% of Coastal's profits. *Id.*

[49] *Id.*

[50] To overcome this obvious defect, the Trustee suggests, in his proposed Findings of Fact and Conclusions of Law, that the Court hold a hearing "to determine how best to proceed to allocate the remaining 25% of the remaining BP Claim proceeds" among all Coastal investors. Doing so would, of course, ensure that each of Coastal's investors receives some interest (and some share of the net settlement proceeds) on account of their investment in Coastal. But the Trustee has failed to offer a coherent theory why the Court is absolutely bound by the membership interests disclosed on Coastal's tax returns when allocating the settlement proceeds between the bankruptcy estate (75%) and Coastal's investors (25%) but is then free to disregard those interests when allocating the 25% share among Coastal's investors.

become a member can be in cash, *property*, or *services rendered*.[51] By allocating membership interests among Maddox and the Interested Parties based solely on the parties' relative cash contributions, the Court would be disregarding Florida law by disregarding Maddox's non-cash contributions to Coastal.

As a factual matter, Coastal did not issue membership interests based on a particular investor's contribution relative to the total amount contributed to the company. For example, Perry Horner contributed 37% of the cash raised by Coastal.[52] Yet, Coastal's tax returns indicate that Horner was only given a 14% interest in Coastal.[53] The same is true for the other investors: the Joneses contributed 13.8% of the cash raised by Coastal but received only a 5.2% membership interest; Rufus Ashby, Sr. contributed 11.4% of the total cash raised but received only a 4.3% interest; and the Owenses contributed 2.6% of the total cash raised but received only a 1% interest.[54] Therefore, allocating the Interested Parties a 67.4% interest in Coastal (and awarding them 67.4% of the net settlement proceeds) because they contributed 67.4% of the amount Coastal raised would not only fail to take into account Maddox's non-cash contribution to the company, but it would also give the Interested Parties a better deal than they bargained for.

---

[51] This is true today and when the Interested Parties made their contributions to Coastal. §§ 608.402(10), .4211, Fla. Stat. (2004); §§ 605.0102(1), .0402 (2021), Fla. Stat.

[52] Interested Parties' Ex. 11, Doc. No. 189-11.

[53] Interested Parties' Exs. 14, 17 & 19, Doc. Nos. 189-14, 189-17 & 189-19.

[54] Interested Parties' Exs. 11, 14, 17 & 19, Doc. Nos. 189-11, 189-14, 189-17 & 189-19.

So what is the Court to do? Neither party has cited the standard this Court must follow in allocating Coastal's membership among its members. The Trustee, however, comes the closest, citing *In re Hillsborough Holdings Corp.* for the proposition that when classifying an advance as debt or equity, this Court should consider (among a dozen or so factors) the intent of the parties.[55] This standard—including the need to consider the intent of the parties—should likewise apply when determining the ownership interest a party received in exchange for an advance that the Court has classified as equity. Therefore, the Court must attempt to reconstruct, based on the record before it, the deal the parties intended.

Let's start with what we know: nine investors (including the Interested Parties) contributed cash to Coastal; Maddox intended to give the investors an ownership (membership) interest in Coastal in exchange for their investments; and Coastal's tax returns reflect that four of the investors received ownership interests in Coastal (Perry Horner – 14%; the Joneses – 5.2%; Rufus Ashby Sr. – 4.3%; and the Owenses – 1%). Because those four investors received their ownership interests, their interests were reflected on Coastal's tax returns and K-1s, and there is no evidence any of the four investors ever objected to the ownership interest reflected on the tax returns and K-1s, the Court concludes the parties intended that those investors receive the ownership interest reflected on Coastal's tax returns: Perry Horner has a 14% interest

---

[55] Trustee's *Proposed Findings of Fact & Conclusions of Law,* Doc. No. 249, at 14 – 15 (citing *In re Hillsborough Holdings Corp.*, 176 B.R. 223, 248 (M.D. Fla. 1994)).

in Coastal; the Jones have a 5.2% interest in Coastal; Rufus Ashby Sr. has a 4.3% interest; and the Owenses have a 1% interest in Coastal.

What about the investors whose ownership interests were not provided for on Coastal's tax returns? Again, let's turn to what we know from the record: Maddox intended that each of those investors would receive a "pro rata" percentage in the company; that "pro rata" percentage was to come from Maddox's ownership interest; but Coastal's accountant failed to take into account that those investors should have received a membership interest in Coastal.[56] So this Court needs to determine the "pro rata" percentage for each investor and then subtract that percentage from Maddox's ownership interest.

The term "pro rata" means "proportionately" or "according to an exact rate, measure, or interest."[57] Although not obvious at first, it is possible to reverse engineer the exact rate or measure Maddox used in awarding membership interests from Coastal's tax returns.

In reviewing the ownership interests that were provided for on Coastal's tax returns, a pattern emerges: each of the investments was based on Coastal having a $5 million valuation. Take Perry Horner, for example. Horner contributed $700,000 in exchange for a 14% ownership interest in Coastal. That imputes a $5 million

---

[56] Trustee's Ex. 78, Doc. No. 195-5, p. 20, l. 19 – p. 23, l. 5.

[57] *Pro rata*, Black's Law Dictionary (10th ed. 2009).

valuation to Coastal.[58] The same is true for the Joneses' investment: the Joneses contributed $260,000 in exchange for a 5.2% ownership interest, which imputes a $5 million valuation to the company.[59] Likewise for the Owenses' investment: the Owenses contributed $50,000 in exchange for a 1% interest, which imputes a $5 million valuation to the company.[60] Surely it is not a coincidence that each of the investments by the four investors whose ownership interests are provided for on Coastal's tax returns imputes a $5 million value to Coastal.

Because Maddox intended that the ownership interests were to be "pro rata," and because the ownership interests for the four investors provided for on Coastal's tax returns were all based on Coastal having a $5 million valuation, the Court concludes that the remaining investors' ownership interests should be based on Coastal having a $5 million valuation. Using a $5 million valuation for issuing membership interests in Coastal, the Hertensteins are entitled to a 2% membership interest for their $100,000 contribution;[61] the Napolis are entitled to a 2% membership interest for their $100,000 contribution;[62] the Plumbing Heating Cooling

---

[58] The price an investor would have paid for his or her interest in Coastal would have equaled the value of the company multiplied by the percentage ownership interest he or she was receiving in the company: Price = Value x Equity Interest. To determine value, then, you divide the price paid for the equity interest by the percentage equity interest: Value = Price / Equity. Using that formula, Horner's investment imputes a $5 million value: $5,000,000 = $700,000 / 0.14.

[59] $260,000 / 0.052 = $5,000,000.

[60] $50,000 / 0.01 = $5,000,000.

[61] $100,000 / $5,000,000 = 0.02.

[62] $100,000 / $5,000,000 = 0.02.

Contractors Association Fund Trust is entitled to a 2.24% membership interest for its $112,000 contribution;[63] Amanda Maddox is entitled to a 0.7% membership interest for her $35,000 contribution;[64] and Vicki Maddox is entitled to a 0.8% membership interest for her $40,000 contribution.[65]

### III. Conclusions

The Court's objective—simple in theory if not difficult in practice—is to reconstruct the deal that the parties intended more than a decade ago when various investors (including the Interested Parties) invested in Coastal. Based on the evidence at trial, the Court concludes that each of the investors should have received, in exchange for their financial contribution, a membership interest in Coastal based on the company having a $5 million valuation.

The Court therefore concludes that the Interested Parties collectively own a 25.44% interest in Coastal; investor Rufus Ashby Sr. owns a 4.3% interest in Coastal; investor Amanda Maddox owns a 0.7% interest in Coastal; Vicki Maddox owns a 0.8% interest in Coastal; and Wes Maddox owns the remaining 67.76% interest in Coastal. The parties agree that Coastal's members are entitled to share in the net settlement proceeds in proportion to their membership interest in the company.

---

[63] $112,000 / $5,000,000 = 0.0224.

[64] $35,000 / $5,000,000 = 0.007.

[65] $40,000 / $5,000,000 = 0.008.

Because Wes Maddox and Vicki Maddox are co-Debtors in this bankruptcy case, the bankruptcy estate is entitled to 68.56% of the net settlement proceeds.[66] The remaining proceeds shall be distributed to Coastal's other investors in proportion to their membership interests.

| Investor | Interest in Coastal | Share of Settlement Proceeds |
|---|---|---|
| Rufus Ashby Sr. | 4.3% | $7,264.85 |
| Kevin & Denise Hertenstein | 2% | $3,379.00 |
| Perry Horner | 14% | $23,653.00 |
| Bruce & Diane Jones | 5.2% | $8,785.40 |
| Amanda Maddox | 0.7% | $1,182.65 |
| Frank & Barbara Napoli | 2% | $3,379.00 |
| Edward & Betsy Owens | 1% | $1,689.50 |
| Plumbing Heating Cooling Contractors Ass'n Fund Trust | 2.24% | $3,784.48 |
| Chapter 7 Estate of Vicki Maddox | 0.08% | $1,351.60 |
| Chapter 7 Estate of Wes Maddox | 67.76% | $114,480.52 |
| **Total** | **100%** | **$168,950.00** |

---

[66] The bankruptcy estate is therefore entitled to $115,832.12 from the net settlement proceeds. Those funds will first go to pay the Trustee's statutory fees and expenses, as well as other administrative expenses, such as reasonable fees and costs awarded to Trustee's counsel. 11 U.S.C. § 726(a)(1). The Court previously approved $137,204.62 in fees and $7,753.62 in costs for Trustee's counsel. But Trustee's counsel, to his credit, agreed to cap his fees at 50% of the amount recovered by the estate. Doc. No. 244. So, based on his agreement, Trustee's counsel is limited to recovering $57,916.06 in fees, plus his costs in this matter.

The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.

---

Attorney Steven M. Berman is directed to serve a copy of these Findings of Fact and Conclusions of Law on all interested parties who are non-CM/ECF users and to file a proof of service within three days of entry.

**Steven M. Berman, Esq.**
**Shumaker, Loop & Kendrick, LLP**
   *Counsel for the Trustee*

**Luis Martinez-Monfort, Esq.**
**Gardner Brewer Martinez-Monfort, P.A.**
   *Counsel for the Interested Parties*